May it please the Court. Your Honors, the question in this appeal is whether a Missouri court has personal jurisdiction over attorneys who came into Missouri many times in many ways over the course of several years to take advantage of and acquire work product that was performed in a Missouri MDL for their own use and benefit outside the MDL. The answer to that question is yes for a number of reasons, but among them are the following. Number one, these defendants' Missouri contacts were both frequent and substantial as the district court found. Number two, but contrary to what the district court found, those contacts also were voluntary and purposeful. Number three, these contacts in Missouri also are what give rise to and directly relate to the causes of action in this case. And number four, the Missouri long-arm statute is, as the defendants themselves conceded below, broadly construed by the Missouri courts and easily satisfied typically, as the defendants said and in this case. Unless Your Honors have any questions about the Missouri long-arm statute, I'd like to spend time on two of the fundamental ways that the district court erred in this ruling. Number one, the idea that these defendants were in Missouri only in representation of federal clients in the MDL, not by choice, but because of the JPML transfer. And number two, the court's overly restrictive analysis on nexus. The defendants' argument in this case goes something like this. We were in the Missouri MDL only because we represented these federal clients and the JPML transferred those federal cases to Missouri. And Your Honors, that analysis from the inception is wrong as a matter of law because it's contrary to the whole notion of specific jurisdiction and the requirement that due process and purposeful availment focus on the defendant's own conduct. So if I could give an example, a couple of examples, Burger King is a good example. In Burger King, there were two people who wanted to open up a restaurant in Michigan. They filed a franchise application in Michigan. They didn't choose for the franchisor to have a home office in Florida, but they did choose to accept the benefits of that relationship from Florida. In Calder versus Jones, a reporter wrote a story about an actress who lived in California. And the reporter said to the court, the Supreme Court, made the argument similar to what the argument that the defendants are making here, it's not my fault. My employer, the National Enquirer, is the one who decided where the circulation of this paper was. And the court rejected that argument because the reporter himself took various activities. He called into California to get information for the story. He knew that the story would be published in California, and he knew it would make a big splash there. So in both of these cases, the defendant doesn't choose the forum originally, but the defendant does exploit the forum for his own advantage. And that's what happened here. If I can give you another very simple example, let's say that one of these defendants came to Missouri, let's say today, come to Missouri to attend a hearing or an argument in the federal courthouse. And while that defendant is here, he rents a car from Avis, and he fails to return or he fails to pay for it. Would a Missouri court have jurisdiction then to call him back to answer for that activity? I would submit yes. Would anybody say that that activity was not purposeful? I would say no. But that's what the defendants are arguing, and that's not the analysis. The analysis in all cases for due process focuses on the defendant's own conduct, what the defendant himself did in or through the forum, and how that conduct relates to the causes of action. Yes, it is true that many of these defendants had federal clients in the MDL that was transferred to Missouri. But this case isn't about what the defendants were doing in representation of their federal clients. This case has to do with what the defendants were doing in Missouri for their state clients and for themselves. The JPML transferred federal cases to Missouri, didn't transfer state cases to Missouri. The MDL leadership order designated certain attorneys in the MDL, plaintiffs and others, to do all of the work in the MDL for the federal plaintiffs in the MDL. Here I'd like to correct real quickly one thing I said in my brief. It is true that that leadership order designated certain counsel to do all the work necessary for all of the plaintiffs in the MDL, but it also allowed for modification. And none of these defendants ever asked for that, other than opposing class certification and when it came time to talk about the Common Benefit Fund, they were content to let the plaintiffs do all the work for all the plaintiffs in the MDL, including their own clients. What about their state clients? Those clients weren't in the MDL, but they had cases running tandem with the MDL. As to those people, as to those clients, these defendants could easily have said, I don't want your documents for what you got from there. I don't want to attend your depositions. I don't want to come to Missouri to attend the bellwether trials. I don't care about your key exhibits in those trials, and I don't want your testimony from those trials. I don't want to come to Missouri in order to negotiate settlement. The defendants could have said no to all of those things, but they didn't. What the defendants did in Missouri in respect to their state clients was no fault of either the JPML or the leadership order. Those were defendants' own acts, and they were voluntary and purposeful. The district court's factual finding that the defendants were only in the Missouri MDL because what they were doing was only in representation of their federal clients is, with due respect to Judge Perry, something that was contrary to the court's duty on a motion to dismiss without a hearing. Frankly, I'm not so sure that there really was much of a factual dispute about what defendants were doing in Missouri and all the occasions that they came into Missouri. And I'll point to something that the defendants said in their brief to this court as illustrative. What they say is that the evidence established that defendants represented rice farmers in Arkansas, Texas, Mississippi, and Louisiana. And then they say, and this is their key point, that defendants never represented rice farmers with cases voluntarily pending in Missouri. And that statement, Your Honors, means virtually nothing. You don't have to have a case in Missouri in order to yourself reach into Missouri for the benefit of that case. And that's what the defendants did. But to the extent that there even was a factual dispute about what the defendants were doing in Missouri when they came into Missouri on the number of occasions that they did, that dispute should have been resolved in plain favor, not the defendants' favor, on a motion to dismiss. There was no hearing? No, Your Honor, there was not. Moving on to nexus. The district court's analysis on nexus really was flawed in, I would say, three fundamental ways. First, the court applied an overly narrow, tort-like standard. Secondly, the court, that was overly narrow in its own right, but secondly, the court applied that standard to a non-tort case. And third, the court segregated out and focused exclusively on this concept of wrongful use when the case, in fact, is broader than that. We set out various nexus standards in our briefing, Your Honors, but truthfully, the district court erred no matter which of those standards is used because none of them would be positive. Even in tort cases, courts don't focus on where the liability-producing conduct occurred. We know that from several cases, including this court's decision in Casino Queen. We also know that from contract cases. Frankly, that's another pretty easy example. In a contract case, the plaintiff will say, you breached a contract, and it may be failure to pay, or it may be doing something else that was an obligation under the agreement. But courts always look to factors, such as where the contract was negotiated. That doesn't give rise to, or that's not the breach, but it does give rise to and relate to the cause of action. So in terms of segregating out this one little aspect and focusing on that entirely, we think the district court erred in that. Here the liability-producing conduct wasn't limited to just use of MDL material in state cases. The claims here are quantum merowit and unjust enrichment. And we set out the elements of those claims in our complaint, and we argued that the defendant's contacts in Missouri were directly related to those elements. So for example, an element of both quantum merowit and unjust enrichment is that the plaintiff conferred a benefit on the defendant. So where that benefit was conferred also is a relevant consideration. Another element for unjust enrichment is that the defendant accepted or appreciated the benefit. And yes, use of MDL work product in Arkansas is evidence of appreciation, but so is coming to Missouri to attend Missouri bellwether trials. Defendants came into Missouri in that way and many other ways to acquire MDL work product for use outside the MDL without compensation. And every time they did that, in every way they did that, the defendants did indeed engage in wrongful conduct in Missouri. Are there still pending one or more state cases on this issue as well? I believe they're all settled, Your Honor. They were all wrapped up into the global settlement with Bayer. So there are no other, no declaratory judgment actions on this particular issue? I'm sorry, Your Honor. I misunderstood your question. The defendants have filed a declaratory judgment action in Texas. Yes, they have. And that's still pending? That is pending, although it's pending under special appearance by many of who the plaintiffs would be in this case who are contesting personal jurisdiction in Texas. You know, I guess that's, and let me say that the court actually just ruled on that and denied the special appearances, but we'll be appealing that. So Texas is a place that, you know, doesn't have personal jurisdiction over everyone and has very little to do with the events that give rise to the cause of action in this case. Almost none, as a matter of fact. You mean there weren't any Texas cases in which you claim that the other lawyers used your material? Let me answer that question in a very pointed way, Your Honor. I guess the answer is yes, but where is the wrongful conduct? Where is the thing that gives rise to the cause of action? All right. I understand that answer, but you're not saying there were no Texas cases? No. No. So. But it's very tangentially. All right. Let me give you a, oh, my time is almost up, and I'll reserve the remainder of my time for rebuttal, unless anybody has any more questions right now. Thank you. Ms. Keller? May it please the court? My name is Kim Keller. I'm here today on behalf of Appalese. I also, before I begin my argument, want to point out that one of the Appalese, Martin Phipps, traveled here today from Texas, and Charles Banks, one of the other Appalese, traveled here from Arkansas today to be present for the argument. Before I begin responsive argument to some of the case law discussed by opposing counsel, I'd like to just briefly highlight a few of the reasons why this case does not belong in Missouri. First, none of the defendants live in Missouri, practice law in Missouri, have an office in Missouri, have employees in Missouri, or are registered to do business in Missouri. None of the defendants filed any cases in a Missouri court, state or federal. None of the defendants entered any contracts with a farmer or other type of client who had a contract with any attorneys who resided in Missouri. None of the cases that Mr. Downing seeks a share of are cases involving Missouri farmers or Missouri land. And remember the crux of this case, Mr. Downing claims that the Appalese used his work product and that he's entitled to remuneration for that use. None of that use occurred in Missouri. Those are just some of the reasons why this case does not belong in Missouri and that personal jurisdiction does not lie over defendants in Missouri. But there's two major distinctions about this case above and beyond all of the case law that's present from the Eighth Circuit or from the United States Supreme Court that should turn this case and require affirmance of Judge Perry's order. The first distinction is the existence of the JPML transfer order. But for that transfer order, no Appalee would have been present in a Missouri court. Every case that Appalese filed, federal or state, were not filed in a Missouri state or federal court. But what difference does that make? Once that is where the litigation was located, the lawyers had to decide, are we going to avail ourselves of that litigation in order to advance our cases in Texas? It makes all the difference, Your Honor, because first, and there are multiple reasons and I'll address all three of the reasons. The first reason that it makes a difference is because but for, and remember the analysis by this court is a totality of the circumstances analysis. But for the JPML order requiring Appalese clients to be present in Missouri, Appalese would have never been present in the MDL court setting in Missouri. The second reason it makes a difference is because, and as Judge Perry pointed out in her order, when Appalese were present in the MDL proceeding, they were not there on behalf of themselves personally. They were there as lawyer representatives for their MDL clients. Simply because the case was transferred to Missouri did not break the bounds of the attorney client requirement under the contract. The Appalese still were required to review the case, participate in the case, and make sure the case was going according to plan. When pleadings were filed, when the trial was attended, Appalese were present, and not all Appalese were present by the way. Be careful about the general language that has been used in both the briefing and the argument because defendants, plaintiffs must establish personal jurisdictions over each and every defendant. One employee of one law firm was present at the Bellwether trial. And that employee was there to review the Bellwether trial on behalf of the MDL clients. Most of the law firms that are Appalese in this case had both federal and state clients. But remember, the crucial and critical factor, as noted by Judge Perry, was where did the use happen? The use that Mr. Downing claims he is now entitled to remuneration based on. As Judge Perry pointed out in her order, there was nothing about the collection of transcripts, the reviewing of depositions, the watching of a trial that would have entitled Mr. Downing to remuneration according to his allegations. It was the use, the later use of that product by Appalese, according to Mr. Downing, for their benefit. The use never occurred in Missouri. And if I could point out the second distinction that I think distinguishes this case from all of the other case law that is available and that was cited, and that's the fact that we have Judge Perry presiding over the personal jurisdiction challenge, the Rule 12b2 motion. All of the allegations by Mr. Downing that he contends constitute the minimum contacts are all litigation related. All occurred and were witnessed by Judge Perry. She was present for the pleadings, for the Bellwether trial. She is someone who is in a unique position to consider these alleged contacts and then to decide later in the second case that was filed whether these contacts are sufficient to confer constitutional personal jurisdiction in accordance with the due process requirements. None of the case law that's available or that has been cited by Mr. Downing has both a JPML transfer order requiring participation in Missouri as opposed to Appalese seeking out Missouri as a forum. And none of the case- Did the Appalese, what was their role in the JMPL? Did they seek a consolidated MDL? No. No, Appalese did not move for the creation of an MDL. Who sought that? Bayer? I'm assuming it was Bayer. I don't know that plaintiffs actually, any plaintiffs actually moved for that. When I looked at the original order, it's- Did they object to it before the MDL panel? The original JPML order did not involve any of the cases that Appalese were a part of. I see. That order is document number one in the 1811 case, the case number that's a consolidated case with this case. That I don't know if, I know that someone objected to it and I know that it was overruled. But when you read the language of the JPML order, it's pretty broad. It says there should be a transfer of any case involving a negligence claim, a products liability claim, as to Bayer's contaminated L.L. Rice. All of the cases that Appalese had that were transferred did fall within that definition. I do believe there was an initial objection that was made that was overruled and that was then relied upon by most plaintiffs when their cases were transferred to the JPML. The plaintiffs, the defendants did however object to the removal of their cases from state court and that was then led to the transfer to the JPML. Thank you. One other case I'd like to point out to the court in my time is the Myers case. It's the Casino Queen case. That case gives probably the best description by this court of how you define the relates to or arises from language that opposing counsel and I seem to be interpreting differently. That case goes through the language that is used by the due process analysis and then looks at the three different ways that courts have analyzed that language. And this court, when reviewing that language, said a totality of the circumstances analysis is appropriate. And in that case, this court looked to varying types of cases and there's a nice string side of cases in there that really gives guidance in how to analyze the case. But what I do know is when looking at other cases involving services, and this court talked about services as opposed to products in the Myers case, this court stated that there was a heightened level of scrutiny when the defendant is accused of some type of liability related to services as opposed to products. So is that the key distinction here then, that when they were in Missouri, sort of the line of services rather than a widget or creation of an item? That's one of the distinctions. I think there are many, Your Honor. The first two are, of course, that the presence there was by virtue of the JPML order. It was never a voluntary seeking out of Missouri. Okay. So setting aside the sort of voluntary, involuntary, they're there, they're acquiring materials. That's different than producing a widget? Is that an important distinction that we should focus on? Because it seems like you could make an argument that this did arise from the acquisition of this material in Missouri. That is an important distinction and the reason why is because, number one, when you look at the personal jurisdiction cases that involve products, there's a stream of commerce analysis that's used where the manufacturer of the product and wherever that product is manufactured has to consider whether it would be foreseeable that the product would travel into other states. When the services are provided, the question that the court looks to is what were the services, how were they sought out, where were they sought out, and then where were they used, where did the defect happen that caused the liability? In the Scullin case and the Viya Systems case, those are two cases that we rely upon, the courts looked at arguments that were made similar to the arguments being made by Mr. Downing and said the fact that the services or the product was created and provided in the forum state is not sufficient. The thing that we look to and the critical inquiry is the defendant's contact with the forum state and whether those contacts are what led to the liability. Here, as Judge Perry noted in her order, the defendant's presence at the Bellwether trial, and that's the only real act that Mr. Downing points to that is actually in Missouri. The discussion of the review of document discovery, there's no evidence about where these documents were collected, housed, distributed. That's not in the record. The discussion about the review of deposition testimony, there's no discussion about where, there were many, many, many depositions. They occurred in Europe, they occurred in North Carolina, so the evidence is really lacking. What do you mean evidence? There was no hearing. Well, Mr. Downing was perfectly capable of providing affidavits, deposition transcripts to show where these were located. And it is Mr. Downing's burden of proof, and the burden cannot be shifted to appellees to disprove jurisdiction. He carries that burden the entire time. So you're saying, from your view, the only action in Missouri that is in the record is attendance by one person at the Bellwether trial? That's correct. I do believe Mr. Downing points to the fact that some appellees filed pleadings in the MDL. And that that, he believes, constitutes some type of contact. However, that then we trace back to, we had to file them there, that the MDL was set there. So settlement discussions or attending depositions, your position is that there's nothing in the record to suggest those were in Missouri. There is a discussion by Mr. Downing of some meetings and settlement negotiations occurring in Missouri. However, I point to the fact that the location of those mediations were by court order. Judge Perry appointed the mediator who was located in Missouri. And Judge Perry appointed Mr. Downing as lead counsel, who then held the meetings at his office. So every single time Missouri was selected as the location, that was not appellees seeking that location out. That was by court order, JPML order, or further order of Judge Perry as presiding over the MDL process. Remember, Mr. Downing has to prove appellees purposefully availed themselves of Missouri. From the very beginning, the JPML order, to the very end, the location of these events that Mr. Downing complains about were governed by court order. Not by an active choice, an affirmative choice by appellees. I have no other argument unless the court has any questions, but I would like to make a personal comment. As a female appellate attorney, it was a privilege to argue before this panel. What's nice, you have a new tool? Both, I think that's quite nice. You're great when you judge appellate. I agree, I agree. Okay, Ms. Garrison. Your Honor, I guess first things first, what is the crux of this case? Is it only wrongful use? Of course it's not. It's not just that somehow a brief or a transcript or testimony or other work product somehow landed at their doorstep and they used it. That's not just what this case is about. They came into Missouri to get it. And they also came into Missouri to avoid paying for it. But in two ways, through their opposition to the common benefit fund on behalf of state plaintiffs and also on behalf of themselves in their own personal capacities, which is shown by their own filings in the court. So what's your response to the position by your opposing counsel that really the only entry into Missouri is the single person watching the bellwether trial? No, Your Honor, clearly that's not correct. Number one, there wasn't just one person who came to watch the bellwether. There was one person, Amanda Hazleton from Mr. Phipps' office, who came to the bellwether for the entirety of the month that it went on. But Mr. Phipps himself came, Mr. Watts came, Mr. Banks came. They all came, and they came for one reason. They weren't there, they didn't have any plaintiffs in those trials. They came there to harvest information for use outside the MDL. That's what they did, and that's what we allege. Is that a business transaction? Absolutely, Your Honor, there's no doubt about it. Let me just say in that respect that the Missouri long arm statute says the transaction of any business. It doesn't make exception for accountants or consultants or lawyers. They were absolutely transacting their own business when they came into Missouri, and the Missouri long arm statute would apply to that. If I could give you another list, I'd like to do it, I'm at four seconds, but I'd like to give you my list if you'd like to hear it, the other contacts in Missouri. Go ahead. That we both alleged, and we present evidence on, and we argued. They attended the Missouri depositions. They accessed briefing in large part that they took and simply replicated in their state trials. They did attend the bellwether trials. They came to Missouri for settlement negotiations, and that's very important. That's part of what we allege is the wrongful conduct here. But if you look at the complaint, and you consider what is at issue here. What we allege is that at the end of the day, the MDL work made possible the global recovery, including the GMB settlement for the state plaintiffs. From which these defendants earned their income, and those negotiations occurred in Missouri. And the defendants traveled to Missouri to attend them. Thank you so very much. We appreciate your time. Thank you both.